NOAH VERNON et al. *v.* BOARD OF POLICE OF TIPPAH COUNTY.

1. DEALINGS WITH FIDUCIARIES AND TRUSTEES.—Fiduciaries and trustees, if they exceed and violate their authority, are responsible, though no bad faith prompted their acts; and those who deal with them must be aware that they exercise only limited and delegated powers, and see to it that they confine themselves within their scope.

2. CHICKASAW SCHOOL FUND.—The board of supervisors of Tippah county are the trustees of the Chickasaw school fund of that county, and the beneficiaries are the successive generations of children in that county.

3. SAME—CASE AT BAR.—Under the act of March 12th, 1850, the board loaned V. $500 of the Chickasaw school fund on deed of trust and note with personal security. Afterwards said board made an order, directing the trustees named in the deed to surrender to V. his note and to cancel the deed of trust, upon his conveying to the president of the board a certain other tract of land, which being done, was all set aside in equity, as being in excess of the authority of the board; but, upon terms, that the land conveyed by V. shall be restored by him, there being no fraud meditated.

APPEAL from the chancery court of Tippah county. REYNOLDS, chancellor.

The board of supervisors and treasurer of Tippah county filed a bill in the chancery court of said county against Noah Vernon and others, in which it is charged that Vernon conveyed lands in trust lying in Tippah county, to secure the payment of a note given by him and W. T. Young and C. J. Haynes, his co-defendants, as securities thereon for money borrowed before that time by Vernon from the "Chickasaw school fund," payable to W. M. Moody, treasurer of said county, and his successors in office. That some time in June, 1868, the board of police of said county passed an order releasing Vernon and his sureties from all further liability to the common school fund of said county, upon the said Vernon's conveying to the president of said board, for the use of said fund, certain other lands, and directed the treasurer of said county to deliver to said Vernon his said note, and to cancel and satisfy the record of said trust deed. All of which was done; and which complainants charge was greatly to the loss and detriment of said school fund. The bill further charges that the said

order of June, 1868, the same being the last order of said board of police, and all of the acts done and proceedings under and by virtue of it, were without authority of law and absolutely null and void, and contains a prayer that they may be so declared, and said trust deed reinstated and carried out according to its tenor and effect, and that said Vernon and his securities be held as fully liable upon their said note, as though said order had never been passed, and asks for general relief.

To the bill a demurrer was filed by defendants, setting forth the following causes, to wit:

1st. That the said complainants have not by their said bill made such a case as entitles them to the relief sought, or to any relief in a court of equity. ·

2nd. That the joinder of the board of police of Tippah county, Mississippi, with Thomas C. Maddox as county treasurer of said county, is a manifest misjoinder of parties.

3rd. That on the 15th day of February, 1870, the circuit court of Tippah county had no jurisdiction of chancery matters.

4th. That the facts alleged in complainants' bill are not sufficient in law to entitle complainants to the relief prayed for, or any relief whatever in a court of equity.

5th. That the board of police had, and still have, no such interest in the subject matter of said court as to entitle them to be made parties complainants in this bill of complaint, and that said board is improperly joined as complainants, for want of interest.

6th. That the powers and duties of the board of police do not authorize, require, or permit the said board of police to sue as complainants upon or for the subject matter included in the suit; and for divers other good and sufficient causes for demurrer. Which said causes of demurrer were overruled by the court and an appeal from

said decision taken to the supreme court. The pleadings were amended by order of the court and by consent of the parties, and the board of supervisors were substituted for the board of police.

The appellant assigns, for error, the decision of the chancellor, overruling the demurrer to the bill of complaint, filed by the defendant in the chancery court of Tippah county.

*John W. Thompson,* for appellant,

Insisted that the bill was defective and that the demurrer should have been sustained. No fraud is charged in the bill citing Adams' Eq, 187, notes; ib. 349, 350, notes; 2 Johns. Ch. 1. There is no allegation in the bill that charges fraud in such manner as to authorize complainants to prove or offer to prove that the compromise was tainted with fraud. Story's Eq. Pl. § 28. A general charge of fraud might be sufficient, but there is no such charge in the bill. Ib. § 268. As to the value of the consideration given by Vernon, in payment or satisfaction of the debt, mentioned in the deed of trust, nothing is said in the bill. It is essential that this consideration should be valuable, but not that it should be adequate. "The parties themselves are the best judges of that." Adams' Eq.; 2 Johns. Ch. 1; 19 Ala. 765; 12 How, (U. S.) 197. Mere inadequacy of price is not sufficient *per se* to set aside a transaction. 4 Allen, 259; Adams' Eq. 378, note 2; 1 Story's Eq. 173; 14 S. & M. 30; 11 Wheat, 103; Story's Eq. Pl. § 257, 257 *a.* Much more is required in allegation and proof to set aside a deed or to decree it to be delivered up to be canceled, than would be sufficient to authorize a refusal of a specific performance. 3 Cow. 445; 6 Johns. Ch. 222; ib. 231, 233; 2 ib. 1.

Counsel contended that, as the compromise was an act of a body of persons acting as a *court* in an official capacity, it must be presumed that they were acting

within the scope of their authority; and that they are not permitted to be heard to allege their own fraud in a court of chancery. Citing 26 Miss. 362; Adams' Eq. 352, 354, notes; Acts of 1856, p. 85, § 12; ib. p. 161, 2.

The compromise of a matter in dispute is a sufficient consideration for a contract, and will bind both parties to the settlement when entered into, in the absence of fraud. Long v. Shackelford, 25 Miss. 559. There is no ground on the face of the bill entitling the complainants to a rescission of the contract. Osgood v. Franklin, 2 Johns. Ch. 23, 24; Ayres v. Mitchell et al. 3 S. & M. 683; Pintard v. Martin, 1 S. & M., Ch. 126 ; authorities cited, *supra.* See also, Adams' Eq. 619, 620 ; 3 How. (U. S.) 333 ; 5 Paige, 612. The people of Tippah county are the *cestuis que trustent,* any small number of whom, may, on the hypothesis of fraud between the board of police and appellant, file a bill to set aside the contract and judgment and order of the board, and on this supposition, they alone can do it. Adams' Eq. 318, 322; ib. 320, note 1; Cary v. Hoscay, 11 Ga. 645.

This board of police was the lawful board and so stated in the bill, and, aside from fraud, their acts in that capacity are valid so far as appellants and the public are concerned. 24 Miss. 418. If acts of an officer *de facto* are valid as to the parties to the proceedings and the public, with equal or stronger reason are the acts of officers *de jure* valid and binding. Lord Hardwicke in 2 Ves. 155. A court of equity will not afford relief against a contract because of fraud unless it be distinctly charged and put in issue by the pleadings. 5 Johns. Ch. 79 ; 6 ib. 543 ; 5 Ga. 346 ; 14 Ark. 360.

*J. S. Morris,* attorney-general, for ` appellees, and *Featherston, Harris & Worsham,* on the same side,

Contended that the action of the court below was correct, and that the demurrer was properly overruled.

Simrall, J. :

The fund in controversy is a part of the school funds of Tippah county, the administration of which was committed by the legislature to the board of police. It is parcel of the Chickasaw school fund, derived from lands donated by Congress for the support of schools, in the district of country ceded by the Chickasaw tribe of Indians to the United States. The law had dedicated the principal to be so invested as that the income therefrom only should be used for the purposes of the charity.

The duty of the board of police is prescribed in the act of 1850, 12th March, which, among other things, enacts that the board of police of Tippah county should loan out the school fund, looking exclusively to the security of said fund, and the prompt collection of the interest, loans to be made on unincumbered real estate. (See 12th sec. p. 142.)

Under this authority, the board loaned to Vernon $500, taking a deed in trust, (county treasurer, trustee,) on a parcel of land. There was also personal security on the note. In 1868, the board of police made an order directing the county treasurer to surrender to Vernon his note, and to cancel and satisfy the deed in trust, on his executing a conveyance to the president of the board, of another tract of land named in the order. All of which was done.

By this transaction it is averred that the school fund of the county largely lost, and the board exceeded its authority. The fund was by law committed to the board of police, as trustee, to be safely invested in real estate, the interest to be promptly collected and applied to the maintenance of schools. The injunction was to look exclusively to the safety of the principal, and prompt receipt of interest. No favoritism or friendship, or enmity, were to influence them in making investment; nothing was to be looked to but a sure preservation of principal, and faithful use of interest.

It is fair to presume that the incumbents of the board in 1861, did their duty, and that the security was on unincumbered land, ample to protect the debt. But in addition, there were two names upon the notes, as securities. The scope of the authority of the board was to call in the principal from time to time, and reinvest. It was to deal with a fund, put out on investment to yield interest. The interest was the means to dispense education. The act of 1855, does not suggest, or intimate the idea that the money may be converted into lands, which, by rental, or otherwise, shall provide means to support schools. Such administration would be a perversion of the trust, an excess of authority under this statute, and might result in the embarrassment, if not defeat, of the entire scheme of the charity.

But it is said that the act of the board in 1868 is authorized by the statute of December 2, 1865, p. 162, sec. 3. It must be noted that this statute was passed just after the close of the war, and before the extent of the losses which it entailed, public and private, had been fully realized. The purpose of the act was two fold : to gather up an inventory of the school funds in the several counties; and secondly, to take measures to secure such portions as might be in danger of loss. The third section is directed to the last object, which makes it " the duty of the president of the board of police in each county to secure the payment of all dues to the school fund, by lien, mortgage, purchase, or judgment, in real estate. In the original act, the word is, " *on* " real estate ; as printed in the acts, it is " *or.*" The title is " the better to secure the payment of the school funds, and for other purposes." It must be noted that the school funds throughout the state, were not controlled and administered by a uniform law. Different modes were applied to the counties, or several counties together. This act so recognizes the state of the law ; therefore, where the moneys were not secured, or safe,

the president of the board shall take lien, mortgage, purchase or judgment on real estate. The implication is that he shall place the debt under a better, and more permanent security; and this he shall do within twelve months after the passage of this act. He *shall secure* the *payment of all dues*, in some one of the modes indicated. There is no authority to surrender a lien or mortgage security already given; he may take security to protect the debt. It may be doubtful whether the power entrusted to the president extended beyond the twelve months after the passage of the act.

Does the arrangement made by the board with Vernon, in 1868, come within the letter or reason of this 3d section? The debt was already secured by a deed in trust on real estate. It is not pretended in the order of the board to the county treasurer, that the security was insufficient, or that the personal sureties were insolvent. The allegation of the bill is that the change of the debt into the land, put a heavy loss on the fund; if that be true, the board are chargeable with a breach of trust, unless the act done be within their discretion. It would not be doubted, that an investment of five hundred dollars, or any other sum in the purchase of land, would be a breach of the trust, and in excess of their authority. The principle is the same, if they convert a solvent debt into land. The beneficiaries of this munificent grant to Tippah and the other Chickasaw counties, are the successive generations of children, in those counties. The boards of police or supervisors of the several counties are the administrators of the fund. They must be kept within the line of duty, strictly. Hogan v. Barksdale, 44 Miss. 191; McLeod v. First National Bank, 42 ib. 113.

Fiduciaries and trustees, if they exceed or violate the authority confided to them, are responsible, although no bad faith prompted their acts; and those who deal with them are aware that they exercise limited and

delegated power; and must see to it, that they confine themselves within the scope of their authority. (Authorities, *supra*.)

If the arrangement made in 1868 is set aside and annulled, it is equitable, (especially as actual fraud was not meditated,) that Vernon should have restored to him the lands conveyed to the president of the board, and the deed canceled, or a reconveyance made. We think the complainants, by their bill, ought to make an offer to do this. It would not be fair and equal, to reestablish the note and deed in trust, without at the same time putting Vernon in *statu quo* as to what he had parted with. White v. Trotter, 14 S. & M. 45.

The demurrer is well taken on this point; but on the return of the cause to the chancery court, the complainants should be permitted to amend their bill.

It is urged by the counsel of the appellant, that the suit ought to have been brought by the *cestui que trust*, or some of them, as representatives of all who have interest in the fund. Whilst a suit might well be sustained in that form, it seems to us, that the present board, as administrators of the fund, and direct representatives of the beneficiaries in its control and use, do for all essential purposes, represent all concerned in it. The exception taken on this point is purely technical, and does not touch the substantial rights of parties. If the board of supervisors were about to misapply the money, or had done any act with respect to it, violative of their duty, and injurious,—then a representative suit might be brought, and would be proper, by one or more of the beneficiaries, for all, to restrain the proposed misapplication, or to annul the excessive and injurious act. But if a subsequent board propose by bill to rectify the errors and wrongs of their predecessors, it seems that if the suit be in good faith, and justice can be done, there is no solid reason why it should not proceed.

. . . For the error indicated, the decree will be reversed

and cause remanded, with leave to complainants to amend their bill.